IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.      3:23-CR-478 (BKS) |
| | ) | |
| **v.** | ) | |
| | ) | **Opposition to Appeal of Detention Order** |
| **PATRICK DAI,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## I.      INTRODUCTION

The government respectfully submits this Memorandum of Law in opposition to the Defendant's Appeal of the Magistrate Court's Pretrial Detention Order. *See* Dkt. 2. On October 31, 2023, Patrick Dai was charged by complaint in the Northern District of New York with making Interstate Threatening Communications, in violation of 18 U.S.C. § 875(c). Dai was arrested in Ithaca, New York, on October 31, 2023, and had his initial appearance on November 1, 2023, before Magistrate Judge Thérèse Wiley Dancks. The Government moved for detention based upon risk of flight/non-appearance and risk of danger as provided in the Bail Reform Act of 1984. *See* 18 U.S.C. § 3141, *et seq*. Magistrate Judge Dancks conducted a full detention hearing on November 9, 2023, and ordered that Dai be detained pending further proceedings.

The defendant has now appealed Judge Dancks's order, arguing in essence that: (1) the government was not entitled to seek detention on risk of danger because the threat offense charged in the complaint does not entitle the government to make such an application; and (2) Judge Dancks's determination as to the defendant's risk of flight is erroneous. For the reasons set forth below, both of defendant's arguments are wrong.

## II.   STANDARD OF REVIEW

If a defendant is ordered detained by a Magistrate Judge, he may file a motion for revocation or amendment of the detention order with the court having original jurisdiction over the offense. 18 U.S.C. § 3145(b).[1] Upon receiving such a motion, the district court must perform a *de novo* review of the magistrate judge's detention order. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir.1985) (finding that a district court should "not simply defer to the judgment of the magistrate, but reach its own independent conclusion"); *see United States v. Vasconcellos*, 519 F. Supp. 2d 311, 314 (N.D.N.Y. 2007) (interpreting *Leon* to require de novo review); see also *United States v. Aref*, 2006 WL 1650660, *1 (N.D.N.Y. Jun. 8, 2006) (conducting de novo review on appeal brought under 18 U.S.C. § 3145(b)).[2] When conducting a *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence. *See e.g., United States v. Colombo*, 777 F.2d 96, 98 (2d Cir. 1985).

## III.   ARGUMENT

### A.   The Government was Authorized to Seek Detention Under 18 U.S.C. § 3142(f)(1)(A)

#### 1.   18 U.S.C. § 875(c) is a Crime of Violence

The Bail Reform Act permits the government to move for detention as follows:

(f) Detention hearing. – The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other

---

[1] Rule 59.1(a)(3) of the Local Rules of Criminal Procedure also governs such appeals.

[2] Even though de novo review is required, courts in this district have also considered the magistrate judge's conclusions in the underlying detention order.  "[T]he court will also consider the magistrate judge's findings and conclusions as an additional factor in its review.  As the court has previously observed, … 'this district has the utmost respect for the highly credentialed professionals who occupy the Magistrate Judge positions …' *Carmona v. Wright*, 233 F.R.D. 270, 276 (N.D.N.Y. 2006).  A magistrate judge's conclusions warrant consideration, especially as they relate to whether release conditions ameliorate flight or danger risks." *United States v.Colin*, No. 1:07-CR-512, 2007 WL 4377723, at *5, fn. 1 (N.D.N.Y. 2007).

person and the community –

(1) upon motion of the attorney for the Government, in a case that involves –

(A) a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed[.]

18 U.S.C. § 3142(f)(1)(A).

Section 875(c) is a crime of violence under the Bail Reform Act. *See* 18 U.S.C. § 3156(a)(4)(A) (providing statutory definition for "crime of violence");[3] *United States v. Capriotti*, No. 21 CR 16, 2021 WL 229660, at *3-4 (N.D. Ill. Jan. 22, 2021) (finding 18 U.S.C. § 875(c) is a crime of violence under the Bail Reform Act and holding a detention hearing pursuant to 18 U.S.C. § 3142(f)(1)(A)) (collecting cases); *United States v. Santoro*, 359 F. Supp. 3d 122, 126–28 (D. Me. 2019) (communicating a threat to injure another person is a crime of violence for detention purposes); *United States v. Choudhry*, 941 F. Supp. 2d 347, 351 (E.D.N.Y. 2013); *United States v. Jackson*, No. 20-118, 2022 WL 716968, at *4, fn. 4 (W.D. Pa. March 10, 2022); *United States v. Christy*, No. 3:18-CR-223, 2020 WL 2794617, at *3 n.5 (M.D. Pa. May 29, 2020); *United States v. Kane*, No. 3:20-mj-5054 TLF, 2020 WL 1660058, at *2 (W.D. Wash. Apr. 3, 2020).

Notwithstanding the foregoing authority, the defendant argues that section 875(c) is not a crime of violence because, as relevant here, it requires the government to prove only a threat to "injure" another person, whereas a crime of violence requires threatened use of "physical force against the person or property of another." *See* Def. Mem. [dkt. 2 at ECF 3]. According to the defendant, "[u]sing physical force against a person does not necessarily result in an injury, and suffering an injury does not necessarily require the use of physical force." *Id.* Defendant cites no decisions adopting this line of reasoning, presumably because it makes little sense. As explained in

---

[3] The term "crime of violence" means — "(A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another[.]" 18 U.S.C. § 3156.

*Santoro*, *supra*, "the question is whether communicating [] a threat to injure is a threat to use physical force," and "[t]he simple answer is yes." 359 F. Supp. 3d at 127. As was the case in *Santoro*, here "[t]he defendant has not explained how one can threaten to injure the person of another without such a threat implying the use of violent force to do so." *Id.*

### 2.    The Bail Reform Act Permits the Government to Seek Detention for Any Crime of Violence

The defendant next argues that, assuming section 875(c) is a crime of violence, the government still cannot seek detention based on danger where the statutory maximum for the offense is five years, because the Bail Reform Act requires that the maximum imprisonment term be 10 years. The defendant's statutory interpretation is wrong.

As set forth above, the government can seek detention on the basis of danger in a case that involves "a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed[.]" The defendant asserts that the phrase "for which a maximum term of imprisonment of 10 years or more is prescribed" modifies each category of offenses (*i.e.*, crimes of violence, a violation of 1591, and offenses listed in section 2332(b)(g)(5)(B)) rather than just the last category (*i.e.*, offenses in section 2332(b)(g)(5)(B)).

The defendant discusses some cases that at least facially support his argument, but they contain little or no analysis and conflict with the decisions of courts that have fully examined the issue (and which the defendant does not cite). For example, the defendant's exact argument was recently advanced and rejected in in *United States v Pietila*, No. 1:23-cr-78, 2023 WL 4313162, at *2 (W.D. MI. July 3, 2023). The court in *Pietila* relied on both basic principles of statutory interpretation (as clarified by the Supreme Court in situations involving modifiers appended to a list of items) and the Bail Reform's legislative history.

[B]ased on the reasoning set out in *United States v. Santoro*, 359 F. Supp. 3d 122,

4

124-25 (D. Me. 2019), and the Supreme Courts statutory interpretation decision in *Lockhart v. United States,* 577 U.S. 347 (2016), the "10 years or more" limitation must apply only to offenses listed in Section 2332b(g)(5)(B). First, *Lockhart* suggests the Court apply the general rule that where there is a series of items, a modifier applies only to the item directly before it. 577 U.S. at 351. Second, as the *Santoro* court noted, the alternative interpretative canon applying the modifier to the entire list cannot apply because one of the items in the list, violations of Section 1591, contains no offenses with penalties less than 10 years in prison (unlike the two other categories of cases). 359 F. Supp. 3d at 125.

The legislative history and context of the statute also suggest that Congress intended that the United States could request a hearing based on danger to the community where the charge involved any crime of violence. Section 3142(f)(1)(A), as originally enacted in 1984, provided for a detention hearing upon motion of the government in a case that involves "a crime of violence" without any limitation as to the possible sentence for the offense. *See* Pub. L. 98-473 (HJRes 648), 98 Stat 1837 (Oct. 12, 1984). Section 3142(f)(1)(A) was amended by the Intelligence Reform and Terrorism Prevention Act of 2004 to ensure the pretrial detention of terrorists and provide a presumption for pretrial detention in cases involving terrorism. *See* Pub. L. 108-458 (S. 2845), 118 Stat 3638 (Dec. 17, 2004). Specifically, in Section 6952 of that legislation, Congress inserted: " ', or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed' after 'violence'." *Id*. Additionally, Congress added the phrase: "or an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed" after the words "or 2332b of this title," in section 3142(e)(3)(C). The inclusion of the limiting phrase in both subsections of the Bail Reform Act evinces an intent to apply the "10 years or more" restriction only to the list of offenses in Section 2332b(g)(5)(B). In 2008, Congress added the third category of cases, violations of 18 U.S.C. § 1591 (sex trafficking of children by force, fraud, or coercion), between "a crime of violence" and the reference to section 2332b(g)(5)(B). *See* Pub. L. 110-457(HR 7311), 122 Stat 5044 (Dec. 23, 2008). That insertion was included in Section 224 of the legislation entitled "Bail Conditions, Subpoenas, and Repeat Offender Penalties for Sex Trafficking." Additionally, the Bail Reform Act references a "crime of violence" without a sentencing limitation elsewhere in the statute, which further demonstrates that Congress did not intend to apply the limiting clause to crimes of violence. *See* Sections 3142(f)(1)(E) and (g)(1). As *Santoro* found, nothing in the amendments to Section 3142(f)(1)(A) or usage of the term elsewhere in the statute reflects an intent to narrow the crimes of violence category in Section 3142(f)(1)(A). 359 F. Supp. 3d at 125.

*United States v Pietila*, No. 1:23-cr-78, 2023 WL 4313162, at *2.

The defendant also argues that this Court already decided this issue in *United States v. Morelli*, No. 22-cr-115, in a brief colloquy with counsel near the close of a change of plea hearing

earlier this year. But this Court's decision was expressly based on "the only case law that's before me" "which is that it must be a crime of violence for which a maximum term of imprisonment of ten years or more is prescribed." (Morelli transcript at 24). This Court then cited two decisions presented to it by the defense in a flow chart submitted hours before, with no analysis, saying that only crimes of violence with statutory maximums of 10 years or more entitle the government to seek detention based on danger. But, as here, the defense neither cited *Santoro* in its argument to the court nor referenced its conclusion in direct conflict with its 'flow chart.' Nor did it mention that *Santoro* had rejected *Madoff* and several similar conclusory decisions because "they simply announced their assertion that the limitation applies to crimes of violence and did not explain how they reached that conclusion," and because those cases "do not directly address the relevant issues." *Santoro*, at 125-26 and 126, fn. 9. The later *Pietila* decision similarly rejected *Madoff* and those decisions because "they offer little reasoning to support that analysis and are therefore not persuasive." *Pietila* at *3. The government cited *Santoro* and *Pietila* in its letter brief to the Magistrate Court (Dkt. 15, 3:23-MJ-00632), and the Detention Order below favorably references both decisions. Detention Order at 2.

Nor does applying the 10-year statutory maximum qualifier to only the last set of offenses listed in 3142(f)(1)(A) make the statute confusing, as the defendant suggests. Rather, it is defendant's convoluted reasoning for applying the qualifier to the earlier classes of offenses that makes no sense. As *Pietila* explained, the second set of offenses (violations of section 1591) has no reason for application of a qualifier at all because Section 1591 contains "no offenses with penalties less than 10 years in prison (unlike the other two categories of cases). *Pietila* at *2, citing *Santoro*, 359 F. Supp. 3d at 125. Further, defendant's assertion that the government's reading of the statute "begs the question whether a detention hearing is mandatory when an individual is accused of a crime under 18 U.S.C. § 2332b(g)(5)(B) carrying a less-than 10-year minimum <u>and</u> the accused

crime is also a crime of violence" does not help his argument. First, the defendant does not identify any offenses in section 2332b(g)(5)(B) that would qualify as "crimes of violence" but that have statutory maximums less than 10 years (*i.e.*, the category of offenses that he claims creates the uncertainty). Second, even assuming that there are one or more such offenses, the three categories of crimes for which the government is entitled to seek detention based on dangerousness under the Bail Reform Act are alternatives, any one of which triggers the government's right to seek detention.

Nor should this Court apply the rule of lenity here. First, the statute is not ambiguous. *Pietila* at *3. Second, the statute is not a criminal provision setting limits on a person's conduct. The rule of lenity exists so that a lay person who needs to conform his conduct to the strictures of a criminal code can reasonably do so, with uncertainty in statutory language being resolved in favor of an interpretation that a person's conduct was lawful. *See United States v. Davis*, 139 S. Ct. 2319, 2333 (2019). But the Bail Reform Act is not a criminal statute. Rather, it sets out the circumstances when the government can seek detention pretrial, which then can only be ordered if the government establishes the required danger or risk of flight and absence of available conditions to mitigate those risks.

### 3.     The Government was Authorized to Move for Detention under 18 U.S.C. § 3142(f)(2) as the Defendant is a Serious Risk of Flight

The defendant also has challenged the Magistrate Judge's determination that the government met its burden to show that he is a serious risk of flight, a basis upon which to seek (and order) pretrial detention even if section 875(c) is not a crime entitling the government to seek detention based on danger.

Contrary to the defendant's argument on appeal (and to the Magistrate Judge below), this case involves a serious risk that the defendant will flee/not appear. The defendant has significant family ties to China. His father is a lawful permanent resident alien who is also a citizen of China,

currently holds and travels on both a US and Chinese passport, and works fulltime for a University in China.  Over the past three years the defendant's father has spent almost half his time living in China.  His family has the resources to pay for the defendant to fly to China to avoid prosecution, and they live 80 miles from the Canadian border. As such, even with an ankle monitor, he could abscond to Canada before the USPO could effectively respond. Furthermore, the defendant has shown an ability and desire to hide his identity when acting in an unlawful manner, posting under anonymous usernames that he repeatedly changed, conducting research on how to change the IP address of his cellular telephone, and using a VPN to mask his location.

Perhaps even more importantly when assessing the defendant's risk of nonappearance or flight, the Magistrate Judge properly considered the extremely troubling and erratic behavior the defendant engaged in the week preceding his arrest. *See* Pretrial Detention Order at 6, Dkt. 18.  The defendant, who has a history of mental health issues, had clearly devolved to new lows in the weeks leading up to his arrest. Outside of the horrific threats he made against both his classmates and the Jewish community at Cornell, he called on others to commit similar atrocities. This all occurred, according to the defendant's interview and anonymous "apology letter," because of his lack of self-control and mental health issues that arose from his social and academic struggles at Cornell.  In this spiral, the defendant, according to his own statements and a forensic review of his cellphone and other personal electronic devices, began exhaustively researching and contemplating the most effective ways to kill himself. Those ways included methods of committing suicide that would harm <u>only</u> himself and other methods that would also cause the death of his mother. This behavior went beyond ideation, according to the defendant, and progressed to multiple attempts at suicide in the days before his arrest.  According to the defendant, after posting his threats he recognized the potential penalties he faced having researched them online. Not wanting to face those penalties, he attempted to kill himself twice with a plastic bag and once with a bed sheet, but

failed on both occasions. Given this conduct, the government is gravely concerned that if released the defendant will take his own life. He is asking to be returned to his home—the very place from which he made his threats and where his mental state deteriorated.

He contemplated and attempted suicide when he thought he might be held accountable for posting his threats. Now that he knows he will be held accountable for his actions and clearly understands the gravity of the penalties he faces, there is no reason to think that the defendant won't again attempt to take his own life and possibly the lives of others in the process.  This risk constitutes a serious risk of non-appearance.

Recognizing this, numerous district courts have considered suicide risk to be an appropriate factor in a detention analysis. *See, e.g.*, *United States v. Metz*, No. 12-M-01193-JJM, 2012 WL 6632501, at *4 (W.D.N.Y. Dec. 12, 2012) (disagreeing that risk of suicide is not a risk of flight); *United States v. Krueger*, No. 13-20242, 2013 WL 8584873, at *2 (E.D. Mich. July 10, 2013) (concluding "that the Bail Reform Act allows and may, in fact, require me to consider the potential of the Defendant committing suicide in the context of assessing his possibility of non-appearance."); *United States v. Wasendorf*, 2012 WL 4052834, *5 (N.D.Iowa, 2012) ("when considering a risk of nonappearance ... the Court may include the risk that a defendant would commit suicide if released").

### 4.      The Section § 3142(g) Factors Support the Magistrate Judge's Decision

#### a.      Nature and Circumstances of the Offense

The defendant terrorized his classmates and, by extension, the Jewish Community at Cornell for multiple days by making a series of online posts stating that he was going to bomb, shoot up, stab, rape and behead his Jewish Classmates and encouraging others to commit similar atrocities. Those threats include among others the following posts:





Not content to merely threaten to commit these atrocities himself, the defendant called on

other people to kill any Jewish person they encountered on campus posting:



**jewish people need to be killed**

if you see a jewish "person" on campus follow them home and slit their throats. rats need to be eliminated from cornell

*Posted By: jew evil*
*Oct 28, 2023 5:39:06 PM*

Post Reply

0 👍 | 4 👎 | 73 Views                                    Report

Another threat Dai posted included the statement that he was "gonna bomb jewish house". These threats naturally terrified the Cornell Jewish community and horrified the nation. The specific threats made against the Center for Jewish Living and Kosher Dining Hall caused Cornell to shut down the dining hall and many of the students living in the Center chose to seek refuge off campus, with some parents coming to Cornell to get their children in the hopes of protecting them from the threats the defendant made to bomb, shoot up, stab, rape and behead them.

The defendant made these threats knowing full well that, as a Cornell student, he had the ability to easily access the people and the buildings he was threatening to attack. He made these threats at a time where he had access to a shotgun and a Kitana sword. He made the threats using different threatening poster names to give the appearance that numerous people were looking to attack and harm the Cornell Jewish Community, thereby maximizing the terror he was inflicting on his intended victims. Compounding the seriousness of the nature of his conduct he not only threatened to commit these horrific acts himself,  he called on others on campus to carry out these attacks as well, urging them to follow Jewish students home and murder them. He communicated these threats anonymously and in a manner designed to maximize their impact on his victims. He understood the legal ramifications of his actions and took steps to conceal his identity and conceal his crimes. He used a VPN to anonymously post an "apology" in an effort to evade his detection

and apprehension. In a further effort to cover up his crimes, forensic analysis of the defendant's cellular telephone has revealed that he deleted his browsing history and researched ways to modify his cell phone's IP address.

<b>b.     Weight of the Evidence</b>

The weight of the evidence against the defendant in this case is overwhelming and is supported both by the defendant's own audio and video recorded statements as well as a subsequent forensic review of the defendant's electronic devices conducted pursuant to a federal search warrant. The threatening posts were traced back to the defendant's parents' house at a time he was residing and present there. Several of the posts were recovered from the defendant's cellular telephone, despite his attempts to delete them. When he was asked about making the threats during his interview, he admitted to making them. He also signed copies of the posts he made and characterized them as extremely messed up statements he posted to get a reaction. He admitted that he specifically mentioned shooting up the Kosher dining hall because he thought it would be scary and create a lot of fear. He also said in his interview that he researched what prison sentence he might get for making terroristic threats and that research was also found on his electronic devices. Finally, the defendant has also admitted to posting the threats in an anonymous "apology" he posted using a VPN to hide his location that he signed "a depressed suicidal person." In that "apology," the defendant admitting making "terroristic threats" and blamed his lack of "self control" citing his need for "more mental health counseling."

Initial forensic analysis of the IP logs has proven the vast majority of the threatening posts were made from the defendant's residence.  Forensic analysis of the defendant's cellular telephone has confirmed that that device accessed the forum and the offending posts.  Shortly after the offense conduct the defendant searched for "change ip of phone" and visited a webpage entitled "How to Change Your IP Address".  Furthermore, a review of the defendant's web browser history

on his cellular telephone revealed that after posting the threats at issue in this case the defendant viewed the following web pages: a BOP webpage entitled "Entering Prison"; a web page with a lengthy article entitled "What CAN You Bring To Federal Prison?"; an article entitled "The Eight Most Important Rules for Surviving in Prison"; and a wikiHow article on "How to prepare for Jail" among other pages evidencing his consciousness of guilt.

> c.      **The History and Characteristics of the Defendant, including Mental Condition, Past Conduct, and Character**

The defendant has a history of mental health issues having taken multiple leaves of absence from Cornell to try to address them.  He reported that he tried to kill himself with a plastic bag and a bed sheet the two days preceding his arrest. The defendant downloaded a book about how to most effectively kill yourself and then proceeded to tell investigators all the ways he had looked into killing himself, and that he had concluded using a gun would be the most effective way. He stated that he was also considering grabbing the steering wheel while his mom was driving him home from Cornell and causing a crash, as well as trying to use carbon monoxide from his parents' car's exhaust in their home's garage.

A forensic review of the defendant's devices is ongoing but so far has revealed searches and articles accessed on mass shootings, the arrest of a minor for making threats to commit mass shootings, and a shooting in a synagogue in San Francisco. Searches for "suicide strategies success rates," made in February of 2023, and a download of a pdf article entitled "Suicide and Attempted Suicide Methods and Consequences."

> d.      **The Nature and Seriousness of the Danger to any Person or the Community that would be posed by the Defendant's Release**

The Court's decision as to whether the defendant remains a threat to **any person** is straight forward. The defendant has demonstrated that he is an extreme danger to himself, having recently tried multiple times to kill himself and, in conjunction with those attempts, having downloaded an

13

article on the most effective way to commit suicide that he discussed at length with investigators. He said during his interview with investigators, "I think I'm more of a threat to myself and my parents and family then than the community." Later in that interview he candidly stated: "Right now I couldn't guarantee that if I went home I wouldn't try to kill myself.  You might have to lock me up for that. I don't mind. It's ok."

Although it might be true that the defendant is *more* of a threat to himself and his family than to the community at large, he still poses a very real and significant threat to the community. Whether the defendant intended to carry out the terrible acts he threatened (and called upon others to do), making the types of threats he made created a significant risk to the community and did real harm. At a minimum, his actions demonstrated a clear headed, calculated effort to terrorize. The choice of topic, the content of the messages, the locations chosen (Jewish Living Center and the Kosher Dining Hall), the calls to others to engage in violence, the different usernames he posted under (none of which were his own), all show a concerted effort to make terrible threats of violence, call others to violence, and to conceal his own identity. The defendant's effort worked. He caused tremendous fear on Cornell's campus, driving some students to leave and others to alter their day-to-day behavior in various ways.

The defendant was able to inflict this terror simply by accessing his cell phone.  The Court is painfully aware of the difficulty of limiting a person's access to internet capable devices.  In this case the defendant is asking to be sent home to a house full of internet capable devices which are being used by his family to both work and attend school.  Asking those individuals, one of whom is a minor, to assure the Court that the defendant will never access any of these devices at any time of day or night is patently absurd.  Any access at home or elsewhere, even momentary access to virtually any internet-capable cell phone, computer, laptop, or similar electronic device, whether prohibited or not, would allow the defendant to create and post more violent threats.

14

Finally, the defendant filed a letter before the detention hearing suggesting that the defendant's posting of a quasi-apology after he made the threats cuts against him truly being dangerous, but the opposite is true. It shows a calculated effort to hedge against the consequences if he were caught. We know this because the "apology" did not include his identity, was posted from a VPN, and when the defendant was first approached by law enforcement he lied and claimed not to know why they wanted to talk to him. In short, the remorse he appeared to express in the "apology" and during his interview *after being confronted with the evidence against him* tells the Court little about his dangerousness other than that he recognizes that expressed contrition might benefit him given the strength of the evidence against him. The point is not that the defendant's anonymous apology and indications of sorrow during his interview are not worthy of some consideration at sentencing if the defendant is convicted. Rather, that it is a thin reed upon which to overturn a determination that this unstable defendant presents a danger and risk of flight/non-appearance.

## IV.    CONCLUSION

This Court should reach the same conclusion as Magistrate Judge Dancks. The government was entitled to seek detention based on danger and risk of flight. Further, that the government met its burden under the applicable factors to support pretrial detention on both bases.

If this Court grants the defendant's motion and sets conditions of release, the government respectfully moves that this Court stay its release order pending the government's appeal of that order pursuant to 18 U.S.C. § 3731.  The government requests this stay for the reasons the government has cited above in support of defendant's continued detention. Although § 3731 requires that any such appeal must be taken within 30 days, the government will undertake to perfect its appeal within 14 days and will move to expedite resolution of its appeal. If this Court

denies the government's motion for a stay pending appeal, the government requests that the Court state the reasons for its decision and issue a temporary stay of its release order for 48 hours, to allow the government time to file a notice of appeal with the Second Circuit and seek a further stay from that Court pursuant to Fed. R. App. P. 8.

CARLA B. FREEDMAN
United States Attorney

By:     */s/ Geoffrey J. L. Brown*

By:    Geoffrey J.L. Brown
       Michael D. Gadarian
       Stephen C. Green
       Assistant U.S. Attorneys
       Bar Roll No. 513495
       Bar Roll No. 517198
       Bar Roll No. 507767